

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-15-2002

# Cecchanecchio v. Cont Cslty Co

Precedential or Non-Precedential: Non-Precedential

Docket No. 01-4468

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Cecchanecchio v. Cont Cslty Co" (2002). *2002 Decisions.* Paper 651.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/651

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT-PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

––––––––––––

No. 01-4468

––––––––––––

DANIELLE CECCANECCHIO,

Appellee

v.

CONTINENTAL CASUALTY CO.,

Appellant

––––––––––––

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

(Dist. Court No. 00-cv-04925)
District Court Judge: John R. Padova

––––––––––––

Argued: September 12, 2002

Before:  ALITO and FUENTES, Circuit Judges, and OBERDORFER,[*] District Judge

(Opinion Filed:  October 15, 2002)

MICHAEL J. BURNS (Argued)

––––––––––––

[*] The Honorable Louis F. Oberdorfer, Senior District Judge for the District of
Columbia, sitting by designation.

TARA B. DICKERMAN
Christie, Pabarue, Mortensen & Young
1880 JFK Boulevard, 10th Floor
Philadelphia, PA 19103

*Counsel for Appellant*

MARK JAFFE (Argued)
TIMOTHY R. HOUGH
Jaffe & Hough
Suite 1907
Two Penn Center Plaza
15th & John F. Kennedy Boulevard
Philadelphia, PA 19102

*Counsel for Appellee*s

---

OPINION OF THE COURT

---

OBERDORFER, <u>District Judge</u>.

Danielle Ceccanecchio brought this action against Continental Casualty Corporation because it denied her claim for long-term disability benefits under her employer's disability plan ("Plan"), which Continental both insured and administered. Continental denied her claim on the ground that the Plan's preexisting condition exclusion applied. The district court disagreed and granted summary judgment for Ceccanecchio. On appeal, Continental argues that it did not act arbitrarily and capriciously because the record clearly

2

establishes that the plaintiff received medical treatment or advice for the same condition that ultimately caused her disability during the 6 months prior to her enrollment in the Plan. Ceccanecchio responds that the exclusion does not apply because the record establishes only that, in that period, she received treatment, advice and inconclusive tests for non-specific symptoms.

We agree with Ceccanecchio. We believe that Continental's application of the preexisting condition exclusion to this set of facts was arbitrary and capricious primarily because it was unsupported, and traversed, by expert medical evidence. Accordingly, we will affirm the district court's grant of summary judgment for the plaintiff.

## I. FACTS AND PROCEDURAL HISTORY

Certain material facts are not in dispute. In July 1994, Ceccanecchio started working as a pharmacist for K-MART Corporation. In March 1997, she applied to participate in K-MART's long-term disability plan (the "Plan"), which was funded through an insurance policy purchased from Continental. The Plan excluded coverage for so-called "preexisting" conditions. The Plan defines a preexisting condition as:

> a <u>condition for which</u> medical <u>treatment</u> or <u>advice</u> was <u>rendered</u>, <u>prescribed</u> or <u>recommended</u> within 6 months prior to the Insured Employee's effective date of insurance. A condition shall no longer be considered preexisting if it causes a loss which begins after the employee has been insured under this policy for a period of 12 consecutive months.

(App. at 146 (emphasis added).) Continental had the discretionary authority to interpret, construe and determine the application of the Plan and its terms. (*Id*. at 81, 114, 126.)

Ceccanecchio's participation in the Plan became effective on May 1, 1997. On

3

April 14, 1997, Ceccanecchio had visited Dr. Jack Jenofsky for a routine gynecological exam. His "progress notes" from that visit indicate that she told him she had been having "urinary frequency and urgency and also nocturia times four for the past year." (*Id*. at 198.) They also indicate that he took a PAP smear and a urine sample for "urinalysis and culture and sensitivity." His only advice to her was that she "see a Urologist if the studies are negative,"(*id*.), which they turned out to be, (*id*. at 200-03). His notes do not include any diagnosis (tentative or otherwise) of any condition or indicate what, if anything, he suspected to be the cause of the urinary frequency. (*Id*.) Nor did he render, prescribe, or recommend any treatment, medication or further testing. His advice was conditional, and there was no hint of disability at that time.

Four months later, on August 4, 1997, Ceccanecchio saw a doctor at CareSource Medical Associates. (*Id*. at 248.) That doctor's notes indicate that her chief complaint was "frequent urination," and that she was referred to a urologist. (*Id*.) On August 26, 1997, she saw Dr. Louis L. Keeler, Jr., a urologist. Dr. Keeler's report, as reflected in a letter written that same day to Arthur Schultes, D.O., states that Ceccanecchio reported that "she voids every half hour as long as she can remember but it has been getting worse. She feels full on very small volumes. She gets up 3-4X at night." (*Id*. at 251.) His letter also states that "Three fillings of [Ceccanecchio's] bladder shows inflammation of the bladder wall suggestive of interstitial cystitis. I have placed the patient on Ditropan. I suggested that she have hydrostatic dilation of the bladder under anesthesia for symptomatic relief and also bladder biopsy to establish the diagnosis of interstitial cystitis." (*Id*.) On or around

4

September 16, 1997, Ceccanecchio underwent a "cytoscopy, hydrostatic dilation of the bladder and four quadrant biopsies of her bladder." (*Id*. at 252.) On September 24, 1997, Dr. Keeler sent a letter to Dr. Schultes enclosing a copy of the biopsy report and stating "it is clearly interstitial cystitis." He requested a "referral for six Dimethystilbestrol treatments, one a week for the next six weeks." (*Id*. at 255.)

"Interstitial cystitis" is defined as:

A condition of the bladder occurring predominantly in women, with an inflammatory lesion, usually in the vertex and involving the entire thickness of the wall, appearing as a small patch of brownish red mucosa, surrounded by a network of radiating vessels. The lesions, known as Fenwick-Hunner or Hunner ulcers, may heal superficially, and are notoriously difficult to detect. Typically, there is urinary frequency and pain on bladder filling at the end of micturition.

(*Id*. at 93, 126.)

On or about September 25, 1997, Ceccanecchio applied for long term disability benefits under the Plan. On September 29, 1997, Dr. Keeler sent another letter to Dr. Schultes which stated: "The patient is so symptomatic in terms of frequency and urgency and nocturia that she is unable to work and is therefore totally disabled. This is certainly a severe case. In my office, she was here for ½ hour and went 3X to the bathroom." (*Id*. at 256.)

On November 4, 1997, Dr. Keeler reported that Ceccanecchio had "completed her DMSO. She has had considerable relief. She is getting up only 2X at night and she voids now only every hour. . . . In the meantime, I have given her a back to work order for two weeks to work part time twenty hours a week. This is without a doubt one of the worse [sic]

5

cases of interstitial cystitis that I have ever seen. I hope we can keep her from being totally disabled by it." (*Id*. at 260.)

On November 17, 1997, Dr. Keeler again saw Ceccanecchio. (*Id*. at 261.) His letter to Dr. Schultes after that visit reported that she was "still going to the bathroom every half hour and she is still up frequently at night at least every two hours and more if she has any fluid intake prior to going to bed. She would love to go back to work. I have decided to try her on Elavil 25 mgs twice a day for one week and then up to 3X a day. If this does not offer some relief then I have recommended that she see Phillip Hanno, M.D. at Temple University." (*Id*.)

By letter dated April 20, 1998, Continental notified Ceccanecchio that her claim for long-term disability benefits was being denied because she had treatment for a preexisting condition. The letter stated: "We have received your medical records from Dr. Jenofsky. You were seen for complaints of urinary frequency and urgency on 4/14/97. You were treated for the condition within 11/1/96 and 4/30/97. Your disability began within one year after your effective date of coverage. Since we have obtained documented treatment within the pre-existing periods, we are unable to honor your claim for benefits." (*Id*. at 191.) There was no mention in the record of any medical opinion support for the finding that her April symptoms evidenced the same "condition" that caused her disability, or addressed to the date of onset.

As provided for under the Plan, Ceccanecchio appealed the denial to Continental's Appeals Committee. Her letter of appeal, dated April 10, 1998, notes that at the time she

6

visited Dr. Jenofsky, "My symptoms were not severe and at no point in time did I ever stop working because of the urinary frequency. It was not until August of 1997, that my symptoms became severe and I sought the medical attention of a urologist." (*Id*. at 176.) On April 10, 1998, Dr. Hanno, who was then treating Ceccanecchio, sent a letter to K-MART, a copy of which was sent to Continental. His letter stated:

> Danielle Ceccanecchio spoke with me today, April 10, 1998, and asked me to send you a note. I have been treating her for interstitial cystitis and she is currently on her third month of Elmiron. Often it takes this medication six months or more to start showing substantial efficacy. It is unclear whether [sic] [when] her symptoms of interstitial cystitis began. Her diagnosis was not made until late August of 1997 and with a disease like this which is manifested by an exaggeration of normal behavior and normal sensation, one cannot say for certain what date it began.

(*Id*. at 172.)

By letter dated August 28, 1998, Continental notified Ceccanecchio's attorney that her appeal had been denied because she "filed a claim related to urinary problems which clearly fall under the purview of the pre-existing condition exclusion as defined by the policy." (*Id*. at 167.) It explained further that "It is irrelevant that the exact diagnosis was not made until a later date. The fact remains that the condition which initiated the filing of a disability claim was treated within the six-month period preceding the effective date of coverage." (*Id*.)

Ceccanecchio filed suit in state court, challenging Continental's denial of her claim for long-term disability benefits as a violation of state law. Continental removed the action to federal court, seeking to dismiss the state law claims as preempted by the Employee

7

Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, as amended by 29 U.S.C. § 1132(a). The district court granted the motion to dismiss, and Ceccanecchio filed an amended complaint, alleging that the denial of benefits violated her rights under ERISA. The parties filed cross-motions for summary judgment. The district court, pursuant to an agreement between the parties, addressed only the application of the preexisting condition exclusion. (*Id*. at 11.) It decided that Continental's decision to apply the exclusion was an abuse of discretion. (*Id*. at 23). It found that Continental's application of the exclusion to Ceccanecchio unreasonably dispensed with the need for evidence of a medical link between her symptoms reported in April 1997, which could have had a number of causes, and the condition, interstitial cystitis, which caused her disability. The district court applied a heightened arbitrary and capricious standard of review, with a degree of skepticism in the middle of the sliding scale, *see infra*, but, in a footnote, noted that it would have reached the same conclusion even under ordinary arbitrary and capricious review. (*Id*. at 26 n.10.) Continental withdrew its remaining affirmative defenses, and final judgment was entered for Ceccanecchio in the amount of $19,730.70. (*Id*. at 9.) Continental appeals from this judgment.

## II. DISCUSSION

On appeal, Continental challenges the District Court's conclusion that the preexisting condition exclusion does not apply; it also argues that the District Court applied

8

the wrong standard of review in reaching that conclusion.[1]

## A.      Standard of Review

Summary judgment is appropriate when the record discloses no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A district court's grant of summary judgment is subject to plenary review; thus, we apply the same standard of review to Continental's decision to deny benefits as the District Court should have applied. *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health and Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000).

Under ERISA, where the terms of a benefit plan reserve to the plan administrator the discretion to determine a claimant's eligibility for benefits, the administrator's decision is subject to review under the "arbitrary and capricious" standard (*i.e.*, a determination of whether the plan administrator abused its discretion in reaching its decision). *See Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 437 (3d Cir.1997). In such a case, the reviewing court may overturn the administrator's decision only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir.1993) (citations omitted).

---

[1]Ceccanecchio's claim for recovery of plan benefits rests on the rights provided by ERISA, so the District Court had jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e). On appeal, we exercise jurisdiction pursuant to 28 U.S.C. § 1291.

However, when the decision of an administrator with discretion is potentially clouded by a conflict of interest, such as where the same entity funds or insures a plan and also administers it, conflict is obvious. That conflict must be factored into the determination of the degree of deference due to the decision of the insurer/administrator denying benefits. *See Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 387 (3d Cir. 2000). In those circumstances, a modified or "heightened" arbitrary and capricious standard of review is appropriate. *See id.* at 390-92.

When applying a heightened level of review, we apply a sliding-scale approach, examining each case on its facts to determine the measure of our scrutiny. *Id.* at 392. In making that evaluation, we consider, *inter alia*, the following factors: (1) the sophistication of the parties, (2) the information accessible to the parties, (3) the exact financial arrangement between the insurer and the company, and (4) the current financial status of the fiduciary. *Id*. at 392. In addition, our scrutiny will be intensified if there were any procedural irregularities in the decision-making process. *Id*. at 393. Ultimately, the inquiry is fact-specific and requires us to evaluate each case by considering the totality of relevant facts. *Id.* at 392.

It is undisputed that Continental had discretion under the Plan to interpret its terms, requiring application of the arbitrary and capricious standard of review. It is also undisputed that it operated under a conflict of interest because it both funded/administered the Plan and determined eligibility for benefits, necessitating the application of a heightened arbitrary and capricious standard of review. However, the parties disagree about

10

where on the *Pinto* sliding-scale this case falls. Ceccanecchio, adopting the position of the District Court, contends that procedural irregularities in the decision-making process, specifically Continental's failure to obtain a medical opinion about the likely date for the onset of the interstitial cystitis, necessitate a degree of skepticism in the middle of the sliding scale. Continental, claiming that none of the four *Pinto* factors fit the facts before us, argues that the District Court should have reviewed the decision at the most deferential end of the sliding scale.[2] It never directly addresses the question of whether there were procedural irregularities and, if so, what impact that should have.

We need not resolve the dispute as to whether Continental's failure to obtain any medical opinion was a procedural error because, even assuming this omission was not a procedural error, we would still reverse the denial of benefits.

**B.      Application of Preexisting Condition Exclusion**

Continental contends that the Plan's preexisting condition exclusion bars Ceccanecchio's claim for long-term disability benefits on the ground that testing ordered in response to her complaint of urinary frequency constituted treatment or advice for the "condition," eventually diagnosed as the disease of interstitial cystitis, which caused her disability. It argues that it is "self-evident from the record" that Ceccanecchio had the same condition in April 1997 as she did in August 1997 because Ceccanecchio complained of "urinary frequency" in April and the primary symptom of acute interstitial cystitis is

---

[2]In its brief, Continental mistakenly states that the District Court placed the case at the most skeptical end of the sliding scale. *Compare* Def. Br. at 15 *with* App. at 22.

"frequent and painful urination."

Ceccanecchio responds that the similarity of symptoms alone is not enough to prove that she had a preexisting condition because the symptoms she complained of in April were non-specific. She asserts, without contradiction, that any number of underlying conditions could have caused her symptoms. She emphasized that there is no expert medical opinion linking her undiagnosed April symptoms to the disabling disease, first suspected in August and first diagnosed in September after specialized testing. Most important, she demonstrates that the only competent opinion about the date of onset of the condition or disease is that of Dr. Hanno that that date cannot be determined.

We agree with Ceccanecchio that she is entitled to benefits. Continental's invocation of the preexisting condition was arbitrary and capricious. Its decision is not supported by, and is in indeed traversed by, competent evidence. It may have been "self-evident" to the inexpert administrator/insurer that Ceccanecchio suffered from interstitial cystitis in April. But it was not evident, much less "self-evident," to her urologist, Dr. Hanno, who formed his opinion after treating her for three months. His informed, expert opinion, and decisive for us, bears repeating:

> It is unclear whether [sic] [when] her symptoms of interstitial cystitis began. Her diagnosis was not made until late August of 1997 and with a disease like this which is manifested by an exaggeration of normal behavior and normal sensation, one cannot say for certain what date it began.

(*Id*. at 172.)

To summarize: our conclusion is based on the following combination of

12

circumstances: (1) in April 1997, Ceccanecchio's symptoms were non-specific and undiagnosed; (2) the April advice was conditional upon the outcome of some tests and preceded by more than four months the diagnosis of a condition and the onset of the patient's disability; (3) no medical evidence supported Continental's contention that it was "self-evident" Ceccanecchio was suffering from the same "condition" in April 1997 that was first diagnosed in September that year; and (4) it was the expert opinion of Dr. Hanno that it is impossible to determine the date of onset of Ceccanecchio's interstitial cystitis. These facts, viewed through the lens of heightened arbitrary and capricious review of the decision of an insurer/administrator, lead to the conclusion that the decision to deny benefits was unsupported by the evidence and therefore an abuse of discretion.[3] Accordingly, we will affirm the District Court's decision to reverse the denial of benefits.

In reaching this conclusion, we are, of course, informed by the recent decision of *Lawson v. Fortis Insurance Company*, 301 F.3d 159 (3rd Cir. 2002). Although it is not a ERISA case and was decided after this case was briefed, both parties cite it as precedent. The *Lawson* plaintiff sought health insurance benefits for leukemia treatments. A few days before the policy took effect, the plaintiff had gone to an emergency room with a number of symptoms. She was then and there diagnosed as having an upper respiratory tract

---

[3]Our conclusion here should not be read to suggest that Continental, or any other similarly situated plan administrator, must obtain a medical opinion before denying benefits under a preexisting condition exclusion. However, by failing to obtain such an opinion Continental assumed the risk that a reviewing court would find its inexpert decision unsupported, if not discredited, by competent, informed, medical opinion evidence.

13

infection and treated accordingly. A follow-up visit to her family physician, after the

policy's effective date, led to a diagnosis of leukemia. The insurance policy at issue

included a preexisting condition exclusion, similar to the one in the present case. The

insurance company refused to pay for treatment for the leukemia, finding that the patient

had received medical treatment for her condition during the exclusionary period. The

District Court reversed the denial of benefits, and we affirmed. We analyzed the

requirement that the earlier treatment be "for" a condition as follows:

> The word "for" connotes intent. Webster's Dictionary states that "for" is "used as a function word to indicate purpose." Webster's Ninth New Collegiate Dictionary 481 (1986). Black's Law Dictionary similarly states that the word "connotes the end with reference to which anything is, acts, serves, or is done. In consideration of which, in view of which, or with reference to which, anything is done or takes place." Black's Law Dictionary 579-80 (5th ed. 1979). The word "for" therefore has an implicit intent requirement.

*Lawson*, 301 F.3d at 165. In light of these definitions, we stated that, "it is hard to see how

a doctor can provide treatment 'for' a condition without knowing what that condition is or

that it even exists." *Id*. Accordingly, the *Lawson* court decided:

> In short, for the purposes of what constitutes a pre-existing condition, it seems that a suspected condition without a confirmatory diagnosis is different from a misdiagnosis or an unsuspected condition manifesting non-specific symptoms . . . .

*Id.* at 166.

In *Lawson* itself, we concluded that the "for" requirement was not satisfied where

neither the patient, her parents, nor the treating physician either intended or thought that the

medical advice or treatment being provided was "for" leukemia.

14

Applying the principles of *Lawson* directly to the present case leads to the same result. It is undisputed that Ceccanecchio's non-specific symptoms could have been caused by any number of conditions. There is no indication in the record that either Dr. Jenofsky or Ceccanecchio suspected a condition of interstitial cystitis or that he treated her <u>for</u> that condition (or any other condition). Indeed, there is no evidence that she had that condition in April 1997; the only competent evidence is that the date of the onset of that condition is unknown and unknowable.

*Lawson* differs, however, from the present case in that the insurance policy there was not governed by ERISA. This difference is potentially significant because the decision in *Lawson* relies, at least in part, on the *contra proferentem* principle of contract construction. The Third Circuit has applied *contra proferentem* in the ERISA context, but only to decide whether a plan granted discretion to the administrator. *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1257-58 (3d Cir. 1993). We have never addressed whether *contra proferentem* may be applied where the plan administrator has discretion to interpret the terms of the plan and the standard of review is arbitrary and capricious. However, a number of other courts have concluded that the doctrine is inapplicable in those circumstances. *See*, *e.g.*, *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1100-01 (10th Cir. 1999) (adopting rule and discussing cases). We need not resolve this issue here because even without *Lawson*, as explained above, we conclude that Continental's decision to deny benefits was arbitrary and capricious.

### III. CONCLUSION

15

We affirm the District Court's grant of summary judgment to the plaintiff.

By the Court,

/s/ Louis F. Oberdofer
District Judge

16